A03A1190. ROME HEALTHCARE, LLC v. PEACH HEALTHCARE SYSTEM, INC.
(590 SE2d 235)

BARNES, Judge.

Rome Healthcare, LLC ("Rome") appeals a verdict entered against it arising from allegations by Peach Healthcare System, Inc. ("Peach") that it breached a management agreement. Rome contends that the trial court should have granted its motion for a directed verdict on Peach's breach of contract and conversion claims because there is no evidence that it did not produce the requested documents and ultimately complied substantially with the contract terms by providing Peach with most of the requested documentation. It also argues that the trial court erred by prohibiting introduction of certain evidence and erred by instructing the jury that only substantial compliance was required to terminate the contract. For the reasons that follow, we affirm the judgment.

1. In determining whether a trial court erred in denying a motion for a directed verdict, we construe the evidence and any doubts or ambiguities in favor of the verdict. "A directed verdict is not authorized unless there is no conflict in the evidence on any material

---

issue and the evidence introduced, with all reasonable deductions[,] demands a certain verdict." (Citations and punctuation omitted.) *Pope v. Professional Funding Corp.*, 221 Ga. App. 552, 553 (1) (472 SE2d 116) (1996); see OCGA § 9-11-50 (a).

2. So construed, the evidence shows that in January 1999, Rome entered into a Management Agreement with Peach to manage five nursing homes operated by Peach. Rome also managed and held the license to two other nursing homes not affiliated with Peach. The five Peach nursing homes were privately owned, but were leased and licensed to Peach.[1] There were five separate Management Agreements, but all relevant portions of the contracts were identical. Pursuant to the Agreement, Rome would receive a management fee of seven percent of the net operating revenues per nursing home and the remaining operating revenues, minus expenses, would be delivered to Peach.

On January 28, 2000, Peach sent a notice of default to Rome, complaining that Rome had failed to comply with the terms of the Management Agreement by not providing Peach with certain financial documentation and reports. Specifically, the letter stated that Rome was to provide copies of bank statements, licensure, and certification surveys, make available for inspection all "books and records and financial data relating to the Facilities," provide within 30 days after the end of each month a reconciliation of actual and budget expenses, financial statements, quarterly census information, and accounts receivable reports for each nursing home, submit for approval a capital and operating budget within 60 days of the end of the year, and furnish to Peach for approval all policy manuals needed to operate Peach's facilities. Peach's lawyer testified that when he did not hear from Rome after two weeks, he placed several telephone calls and sent a fax referencing the letter to Rome's owner. Rome responded approximately one month later and said that it would send the requested materials. Peach's lawyer testified that two weeks later Rome sent a "stack of papers" with "no description or any itemization. Didn't seem to be any order to the materials. But we went through that and ultimately we prepared a list of items that we felt had been provided and items that were not provided." In May 2000, the lawyer talked with a Rome representative and told her the additional items that were needed, but he never received the documents.

---

[1] The five nursing homes were Cedartown Health Care Center owned by Moroni Health Care, Inc., Gateway Health Care Center and Floyd Health Care Center owned by A & M Investments, Friendship Health Care Center owned by James and Janie Morris, and Sandmont Health Care Center owned by a trust.

On July 1, 2000, Bart Miller purchased Peach from Joan Dupont. On August 11, 2000, Peach sent Rome another letter deemed a "Second Notice of Default under Management Agreements dated January 29, 1999," complaining that "Rome Healthcare furnished us with certain documents pertaining to the various facilities, but the material provided was incomplete and not fully responsive to our prior demands." Included with the letter was a chart showing the materials Rome had furnished and the materials Peach had not received. On September 1, 2000, Peach sent a letter that terminated the Management Agreement, and asked Rome for all financial information regarding the Peach facilities.

On September 29, 2000, Peach filed the underlying complaint against Rome for breach of contract, breach of implied duty of good faith and fair dealing, conversion, racketeering, negligence, and breach of fiduciary duty, seeking damages of not less than $1,132,827.74. Rome answered and filed a counterclaim for breach of contract.

The case went to trial in October 2002, and upon Rome's motion, at the close of Peach's case-in-chief, the trial court granted a directed verdict on the breach of duty of good faith and fair dealing and breach of fiduciary duty claims, but denied the motion on the breach of contract and conversion claims. Rome renewed its motion for a directed verdict on the remaining claims at the close of its case-in-chief and the trial court once again denied the motion as to those claims. Following deliberation, the jury returned a verdict of $1,161,193.24 for Peach, and also found for Peach on Rome's breach of contract counterclaim. This appeal followed.

The contract provided that Rome was to provide for the payment of accounts payable, employee payroll, taxes, insurance premiums, and other obligations of the Peach nursing homes. Peach presented evidence at trial that Rome had on occasion failed to meet payroll, and did not pay the payroll taxes on the Peach facilities. There was also evidence that Rome had violated the Management Agreement by failing to notify Peach in writing before entering into service contracts with Rome affiliates. Section 3.1 of the Agreement stipulated that Rome

> shall not, without the prior written consent of Lessee, cause Lessee to enter into any contract with Manager or any Affiliates for services required to be provided Manager under this Agreement, or pay any amount to Manager, or its Affiliates, other than the fees provided in Section 2 of this Agreement and the reimbursement of expenses to unrelated third parties.

Peach provided evidence that Rome entered into contracts for therapy services with Right Care, Inc. and Enhanced Care Solutions, two of Rome's affiliate companies, without prior written approval. Peach also presented evidence that Rome charged Peach for the services of its regional nurse, controller, and director in violation of the Agreement's provision prohibiting Rome for charging separately for any specialized consultants Peach might hire.

Rome also argues that the denial of its directed verdict on the breach of contract claim was error because it was not in default of the Agreement. The default provision of the Agreement provided that:

> Section 5.1 (b) *Default*. If Lessee or Manager or any of Manager's Affiliates shall fail to keep, observe or perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by it, or Lessee shall unreasonably withhold its approval of the budget submitted by the Manager, and such default shall continue for a period of thirty (30) days after written notice by the non-defaulting party to the other specifying the default in questions [sic] and requesting that the default be cured, then in case of any such event and upon the expiration of any applicable period of grace this Agreement shall expire, at the option of the non-defaulting party on ten (10) days further written notice to the other party, provided that, except with respect to monetary defaults of Lessee or Manager, if the defaulting party has commenced cure within such thirty (30) day period, and diligently pursues such cure after the thirty (30) day period, then the right to give such ten (10) day notice of termination shall be suspended for the time necessary to effect such cure.

Under Section 1.5 of the Agreement, Rome was required to provide Peach, either upon request or by the terms of the Agreement, with certain documentation, including, but not limited to, a capital and operating budget, financial statements, census reports, licensure and certification surveys, and aged accounts.

As noted earlier, Peach sent Rome the first default letter in January 2000 requesting certain materials and reiterated the request via a telephone conversation in May 2000. Because Rome only supplied some of the materials, Peach mailed a second letter of default in August 2000. Rome did not respond and Peach terminated the Agreement approximately two weeks later.

If any evidence supports the trial court's denial of a motion for directed verdict, this court may not disturb the jury's verdict. *Grindle v. Chastain*, 229 Ga. App. 386, 389 (2) (493 SE2d 714) (1997). Accord-

ingly, because some evidence supports Peach's breach of contract claim, the trial court did not err in denying Rome's motion for directed verdict.

3. Rome contends that, because Peach's conversion claim was barred by the express terms of the contract, it was entitled to a directed verdict on the claim. We disagree.

In its conversion claim, Peach asserted that Rome refused to return certain documentation belonging to Peach and had made unauthorized loans and employee payments. Rome argues that there is no evidence that Rome used Peach's assets without Peach's permission. It maintains that the funds were accurately accounted for and Peach expressly authorized any uses.

> Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation. . . . [I]n order to be chargeable with conversion, technically it is not necessary that the defendant assert any right of ownership over the property; it is sufficient if the defendant wrongfully assumes dominion over the property inconsistent with the owner's right. . . . It is immaterial that such dominion was exercised in good faith, for [w]hoever meddles with another's property, whether as principal or agent, does so at his peril, and it makes no difference that in doing so he acts in good faith.

(Citations and punctuation omitted.) *Maryland Cas. Ins. Co. v. Welchel*, 257 Ga. 259, 261 (1) (356 SE2d 877) (1987).

Based on the evidence, a jury could reasonably infer that Rome exercised dominion over monies that should have belonged to Peach. As noted earlier, there was evidence that Rome made unauthorized payments for the services provided by its regional director, regional controller, and regional nurse in direct contradiction to the Agreement. There was also evidence that Rome pledged the accounts receivable belonging to the five Peach facilities to secure a $5 million line of credit held by Peach and its affiliates. Peach's former owner testified that she signed a security agreement which she believed was for a $500,000 line of credit for the five Peach facilities. Peach's accounting expert testified that Rome owed Peach over $780,000 for expenses other than the normal operating fees.

Given that some evidence supported Peach's conversion claim, a directed verdict was not appropriate and the trial court did not err in denying Rome's motion.

4. Rome next argues that the trial court erred by refusing to admit into evidence the Master Agreement. Rome argues that the Master Agreement was admissible under OCGA § 13-2-2 (1)[2] to prove the attendant and surrounding circumstances in the making of the Management Agreement. After review, we find no error.

A decision to admit or exclude evidence, including relevant evidence, is reviewed for abuse of discretion. *Dept. of Transp. v. Mendel*, 237 Ga. App. 900, 902-903 (2) (517 SE2d 365) (1999).

Before entering into the Management Agreements with Peach, Rome entered into a contract deemed the Master Agreement with seven individual nursing homes, including the five Peach nursing homes. The parties in the Master Agreement included Rome, its affiliate Right Care, Inc., and the individual owners of the nursing homes. Peach was not a party to the Master Agreement. According to the terms of the Master Agreement, the parties "will cause an unrelated third party to Lease and/or Sub-Lease the seven nursing homes and one personal care home controlled by the Owners and Lessees," and "shall cause the unrelated third party to enter into seven Management Agreements . . . with Rome Healthcare." Thereafter, Peach subleased five of the nursing homes and entered into the Management Agreements with Rome.

During the trial, Rome attempted to introduce evidence of the Master Agreement during the cross-examination of Peach's current owner, Miller. Upon Peach's objection to the relevance of the document, Rome responded that the Master Agreement was relevant to show that Peach was a "straw operation" because

> under the master agreement, the owners, Morris, McAlpin, and Abercrombie agreed to get an entity to lease the homes from them and to enter into management agreements with Rome and the owners agree that they're going to split the profits from the operation of these homes with Rome, two-thirds going to the owner, one-third going to the manager, so there would be no money left to go to Peach.

Peach responded that it had nothing to do with the Master Agreement, but rather it was "a deal between those gentlemen or those entities and Doug Wright, Jr., to buy property. It has nothing to do with the management of the facilities and that's the issue in this

---

[2] Parol evidence is inadmissible to add to, take from, or vary a written contract. All the attendant and surrounding circumstances may be proved and, if there is an ambiguity, latent or patent, it may be explained; so, if only a part of a contract is reduced to writing . . . and it is manifest that the writing was not intended to speak the whole contract, then parol evidence is admissible. OCGA § 13-2-2 (1).

case." The trial court excused the jurors for the day, and heard more arguments regarding the admissibility of the Master Agreement.

Apparently, rather than deal directly with Rome, the nursing home owners needed an intermediary to lease the facilities because "if [Rome] managed directly for the owner[,] due to some Medicare regulation, the reimbursement would go down and therefore the amount that they could charge as a lease would go down." Rome argued that its negotiation regarding the management of the nursing homes was done with the individual owners in the Master Agreement, and "the master agreement is controlling as to our management of these homes."

Rome continued that the jury needed to hear about the Master Agreement because of the conflicting provisions in the documents about the cash flow of the profits. In the Management Agreement, Rome was to receive a fee of seven percent of the net operating fees of each nursing home, but in the Master Agreement, profits were "split with two-thirds of cash flow in excess of the true out-of-pocket expenses going to the Owners and Lessees and the remaining one-third of excess cash flow shall be paid to the Manager in the form of a Bonus." Rome argued that if the jury did not hear about the Master Agreement provision, it would make erroneous conclusions about the allocation of the profits, because "[w]e can't pay Peach 93 percent of the profit for the revenue and at the end of the year give two-thirds of the 93 percent that Peach has to the owner." The trial court reserved ruling on the admissibility of the Master Agreement. The following day, the trial court heard additional arguments before ruling that the document was not relevant. The trial court stated that it would be willing to revisit the issue if at a later point it appeared that the Master Agreement was relevant. The admissibility was revisited again when Rome's principal, Doug Wright, was on the stand, and the trial court ruled that it would not admit evidence of the Master Agreement because it amounted to parol evidence, and the Management Agreement was not ambiguous.

The Management Agreement contained a merger clause stating that the contract constituted the entire agreement between the parties, "and no prior oral or written, and no contemporaneous oral representations or agreements between the parties with respect to the subject matter of this Agreement shall be of any force or effect."

The purpose of merger clauses is to preclude any unilateral modifications of a written contract through evidence of pre-existing terms that were not incorporated into the written contract. *Thomas v. Garrett*, 265 Ga. 395, 396 (1) (456 SE2d 573) (1995). Where parties have reduced to writing a complete and certain agreement, the court will, in the absence of fraud, mistake, or accident, conclusively presume that the writing contains the entire contract, and parol evidence of

prior or contemporaneous representations or statements is inadmissible to add to, take from, or vary a written contract. See OCGA § 13-2-2 (1); *Andrews v. Skinner*, 158 Ga. App. 229, 231 (279 SE2d 523) (1981). Although Rome now complains about the conflicting provisions in the documents regarding the allocation of the profits, Rome knew about the terms of both documents when it entered into the Master Agreement with the owners because the Management Agreement was included as an attachment to the Master Agreement. "Parties [are] entitled to contract on their own terms without the courts saving one side or [the other] from the effects of a bad bargain." *Thomas v. T & T Straw, Inc.*, 254 Ga. App. 194, 196 (561 SE2d 495) (2002). Peach was not a party to the Master Agreement, and thus any agreement Rome entered into for its own benefit with the third-party owners of the nursing homes is not relevant to the separate contract Rome and Peach had to manage the facilities.

Even if the Master Agreement were relevant, a trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence. See generally *Dept. of Transp. v. Mendel*, supra, 237 Ga. App. at 902 (2). Certainly, this convoluted management scheme — admittedly structured to allow the nursing home owners to recover more money in lease payments — might confuse and obstruct the issues at trial. These matters are appropriately within the sound discretion of the trial court. Id. at 902-903. Here, Rome has failed to establish that the trial court abused its discretion in excluding the Master Agreement, and we reject its claim of error.

5. Finally, Rome asserts that the trial court erred in charging the jury that only substantial compliance with a contract's termination provision is required.

The general rule in determining contract compliance is substantial compliance, not strict compliance, *Dennard v. Freeport Minerals Co.*, 250 Ga. 330, 332 (1) (297 SE2d 222) (1982); see also OCGA § 13-4-20, and this rule applies to a contract's termination clause as well. *DI Uniform Svcs. v. United Water Unlimited Atlanta*, 254 Ga. App. 317, 323 (2) (562 SE2d 260) (2002). Although in some circumstances this court has "required strict compliance to terminate an agreement, these cases concerned termination notices that resulted in forfeiture of real property rights under a lease or easement, or revocation of a surety." (Footnotes omitted.) Id.

Thus, in these circumstances the trial court did not err in charging the jury that only substantial compliance with a contract's termination clause is required.

*Judgment affirmed. Andrews, P. J., and Adams, J., concur.*

DECIDED NOVEMBER 21, 2003 — 

*Armstrong Allen, Jeffrey C. Smith, John Stuber,* for appellant.
*Epstein, Becker & Green, Jeffery R. Saxby, Womble, Carlyle, Sandridge & Rice, Frank G. Goldman,* for appellee.