**FIFTH DIVISION**
**BARNES, P. J.,**
**REESE, P. J. and MARKLE, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 15, 2020**

# In the Court of Appeals of Georgia

A20A1378, A20A1401. WANNA v. NAVICENT HEALTH, INC. et al.; and vice versa.

BARNES, Presiding Judge.

Dr. Fady S. Wanna previously was employed by Navicent Health, Inc. f/k/a Central Georgia Health Systems, Inc. ("Navicent") and Navicent's affiliate, Health Services of Central Georgia, Inc. ("Health Services"). This lawsuit concerns a dispute between the parties over Dr. Wanna's contracts governing his employment with Navicent and Health Services and the sale of his medical practice. In his complaint, as amended, Dr. Wanna asserted claims against Navicent and Health Services for breach of his employment agreements, fraud, negligent misrepresentation, violation of the Employment Retirement Income Security Act of 1974 ("ERISA"), and attorney fees and expenses under OCGA § 13-6-11. In their answer, as amended, the

defendants asserted counterclaims for breach of contract, breach of non-compete and non-solicitation covenants, breach of the duty of loyalty, breach of fiduciary duty, and attorney fees and expenses under OCGA § 13-6-11. At issue in these companion appeals are two summary judgment orders relating to those claims and counterclaims and a discovery order entered by the trial court.

In Case No. A20A1401, Navicent appeals the trial court's denial of its motion for summary judgment on Dr. Wanna's breach-of-contract claims relating to the failure to pay him severance and an annual bonus or to provide him with director and officers ("D & O") liability insurance coverage. Navicent also appeals the trial court's denial of its motion for summary judgment on Dr. Wanna's ERISA claim. Lastly, Navicent appeals the denial of its motion for summary judgment on Dr. Wanna's claim for OCGA § 13-6-11 attorney fees. For the reasons discussed below, we reverse the trial court's denial of Navicent's motion for summary judgment on Dr. Wanna's breach-of-contract claim predicated on the failure to pay him an annual bonus; we vacate the denial of Navicent's motion for summary judgment on Dr. Wanna's ERISA claim and remand with direction as to that claim; and we affirm in all other respects.

In Case No. A20A1378, Dr. Wanna appeals the trial court's grant of summary judgment to the defendants on his fraud and negligent misrepresentation claims; the

2

denial of his motion for summary judgment on certain of the defendants' counterclaims; and the denial of his motion to compel discovery relating to Navicent's decision not to pay him particular contractual compensation and benefits. For the reasons discussed below, we vacate the trial court's grant of summary judgment to the defendants on Dr. Wanna's fraud and negligent misrepresentation claims and remand with direction as to those claims. We affirm in all other respects.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citations, punctuation, and footnote omitted.) *Testamentary Trust of Moseley v. Barnes*, 245 Ga. App. 817, 817 (538 SE2d 873) (2000). See OCGA § 9-11-56 (c). Guided by these principles, we turn to the record in the present case.

*Factual Background.* Navicent is the corporate parent of the Medical Center of Central Georgia, Inc. ("Medical Center"), which operates an acute care hospital in Macon, Georgia. Health Services is a subsidiary of Navicent that employs physicians in various specialties and provides faculty and physicians to the Medical Center.

3

Dr. Wanna is a surgeon who is licensed to practice medicine in the State of Georgia and is board certified by the American Board of Thoracic Surgery with a specialty in cardiothoracic and vascular surgery. Dr. Wanna is a former executive of Navicent and a former physician of Health Services who held clinical privileges at the Medical Center. Central to this case are the contracts that Dr. Wanna entered into with Navicent and Health Services that governed his employment as an executive and physician and the sale of his medical practice.

*The Executive Agreement.* Effective July 1, 2013, Dr. Wanna and Navicent entered into an employment agreement under which Dr. Wanna agreed to serve as a Vice President and the Chief Clinical Officer of Navicent ("Executive Agreement"). The initial term of the Executive Agreement was three years.

Pursuant to the Executive Agreement, Navicent agreed to pay Dr. Wanna a base salary and certain benefits, including severance compensation if he resigned his executive position for "Good Reason at any time" after providing Navicent notice and an opportunity to cure. "Good Reason" was defined to include a material reduction in Dr. Wanna's base salary.

Under the Executive Agreement, Dr. Wanna also was eligible under certain circumstances for annual incentive compensation under Navicent's Management

4

Incentive Plan ("MIP") and retirement benefits under its Supplemental Executive Retirement Plan ("SERP"). Additionally, Navicent agreed to provide Dr. Wanna with D & O liability insurance that covered him in his individual capacity and in his executive capacity as an officer of Navicent. Lastly, the Executive Agreement contained restrictive covenants, including non-compete and non-solicitation provisions that applied to Dr. Wanna during his employment and for a designated time period thereafter.

*The Physician Agreement.* While serving in his executive position, Dr. Wanna continued to maintain his cardiac surgery practice but reduced the number of surgeries that he performed. In 2014, Dr. Wanna entered into a physician employment agreement with Health Services that set out the parameters of his continued work as a surgeon ("Physician Agreement"). Under the Physician Agreement, Dr. Wanna agreed to work as a part-time physician and cardiothoracic surgeon with Health Services and remain a member of the active medical staff at the Medical Center while continuing to work as an executive for Navicent. Health Services agreed to pay Dr. Wanna a base salary as well as productivity compensation.[1] The initial term of the

---

[1] In July 2015, Dr. Wanna and Health Services executed a first amendment to the Physician Agreement that revised the language addressing productivity compensation. The first amendment to the Physician Agreement is not at issue in

5

Physician Agreement was three years, but Dr. Wanna was entitled to terminate the Physician Agreement "at any time upon the occurrence of a material breach of the terms of this Agreement by [Health Services]" if Health Services was afforded notice and an opportunity to cure. The Physician Agreement also contained a non-compete covenant.

Prior to entering into the Physician Agreement, as part of his private medical practice, Dr. Wanna also performed cardiothoracic and vascular surgeries at Coliseum Medical Center, another hospital located in Macon. After entering in the Physician Agreement, Dr. Wanna continued to perform surgeries at Coliseum. Coliseum was not expressly named or discussed in the Physician Agreement. However, according to Dr. Wanna, Health Services assured him that he could continue to perform surgeries at Coliseum during the term of the Physician Agreement, and after execution of the Physician Agreement, Health Services billed and collected for the surgeries that he performed at Coliseum and calculated his productivity compensation based in part on the surgeries he performed there. But Martin Plevak, Chief Executive Officer ("CEO") of Health Services, testified that while Health Services initially

these appeals.

6

allowed Dr. Wanna to continue to perform surgeries at Coliseum, it never guaranteed that he would be permitted to do so throughout the term of the Physician Agreement.

*The Asset Purchase Agreement*. Effective March 2015, Dr. Wanna and Health Services executed an agreement under which Health Services agreed to purchase the assets of the professional corporation owned by Dr. Wanna and his surgeon partners ("Asset Purchase Agreement"). The Asset Purchase Agreement contained non-compete and non-solicitation covenants applicable to Dr. Wanna.

*The Regulatory Compliance Issue.* In 2015, Navicent's General Counsel, Kenneth Banks, and its Compliance Officer, Steve Orquist, informed Dr. Wanna that someone had raised a regulatory compliance issue that involved him. According to Dr. Wanna, when he asked them to identify the compliance issue, they would not explain the basis of the accusation and told Dr. Wanna to hire an attorney. Although Navicent maintained D & O liability insurance coverage for its executives, Banks and Orquist did not mention the policy to Dr. Wanna, and Navicent did not submit a claim on his behalf at that time. Banks hired counsel at his own expense to resolve any compliance issues.

*Dr. Wanna's Resignation from His Executive Position.* According to Dr. Wanna, in August 2015, Navicent's Senior Vice President for Human Resources,

7

Barnee Price, told him that a final decision had been made to change his job description and reduce his base salary by more than 32 percent. The change was to take effect on October 1, 2015. In contrast, Price testified in his deposition that he shared with Dr. Wanna his recommendation regarding how much Dr. Wanna's salary should be reduced if he changed executive positions, but that a final decision had not been made by Navicent on the issue.

On September 1, 2015, Dr. Wanna's counsel sent a letter to Navicent stating:

> I am writing on behalf of my client, Fady Wanna, M.D., pursuant to Section 4 (b) (1) (i) of [the Executive Agreement]. My client is resigning for good reason pursuant to such section of his [Executive] Agreement as there has been a material reduction in his base salary which was not a uniform reduction in salary consistently applied to other similarly situated employees. My client was notified on August 13, 2015 by Barnee Price of his new job description which is the same as his old job description and the reduction in his compensation of approximately 30%. Pursuant to Section 4 (b) (1), [Navicent] has 30 days from the date of this letter to cure such material reduction in my client's compensation.

On September 14, 2015, Dr. Wanna and Navicent's President and CEO, Dr. Ninfa Saunders, sent a joint email message announcing Dr. Wanna's resignation from his executive position with Navicent. The email stated that the announcement would

8

be "effective October 1, 2015." On September 24, 2015, Dr. Wanna was present at a meeting of Navicent's Board of Directors where Dr. Saunders announced his resignation. Dr. Wanna continued to work in his executive position through September 30, 2015.

According to Dr. Wanna, he spoke with General Counsel Banks several times after September 1, 2015, and Banks assured him that the notice he had given was sufficient and that Navicent would not withhold Dr. Wanna's benefits on a technicality. A dispute ultimately arose, however, between Dr. Wanna and Navicent over whether he was entitled under the Executive Agreement to severance pay, a MIP bonus for 2015, and SERP benefits for 2014 and 2015.

*Termination of the Physician Agreement.* On September 30, 2015, Dr. Wanna and Health Services executed a second amendment to the Physician Agreement under which Dr. Wanna agreed to increase his work schedule such that going forward he would be a full-time cardiothoracic surgeon, given that he would no longer be serving in his executive position with Navicent. Consequently, Dr. Wanna returned to full-time clinical practice on October 1, 2015.

On October 31, 2016, Health Services adopted a policy, effective January 1, 2017, that required physicians employed by Health Services to practice "exclusively

9

at Navicent facilities." Under the policy, Dr. Wanna would no longer be allowed to perform cardiothoracic surgery at Coliseum.

After the announcement of the policy, Dr. Wanna notified Health Services of his objection to the policy change and asserted that prohibiting him from practicing at Coliseum breached the Physician Agreement. Dr. Wanna notified Health Services that he would terminate the Physician Agreement if the alleged breach was not cured.

In February 2017, Dr. Wanna's counsel sent a letter to Health Services's counsel stating that Dr. Wanna was terminating the Physician Agreement for cause because Health Services had materially breached that Agreement by implementing the new policy that restricted him from performing surgeries at Coliseum. Dr. Wanna thereafter ceased performing any job duties for Health Services and stopped performing surgeries at the Medical Center. Dr. Wanna continued to perform surgeries at Coliseum.

In March 2017, counsel for Health Services wrote a letter to Dr. Wanna's counsel stating that Dr. Wanna was in material breach of the Physician Agreement by ceasing to perform his job duties and had no legal basis for purporting to terminate the Physician Agreement for cause. The letter demanded that Dr. Wanna cure his alleged breach by resuming his job duties with Health Services. Health Services's

10

counsel sent a follow-up letter later that month stating that Health Services was terminating the Physician Agreement for cause based on Dr. Wanna's nonperformance of his contractual duties.

*Procedural Background.* In March 2017, Dr. Wanna filed the present lawsuit against Navicent and Health Services. Count 1 alleged breach of the Physician Agreement based on Health Services's policy change that restricted him from performing surgeries at Coliseum and sought a declaration that the non-compete covenant contained therein was unenforceable because he had properly terminated the Physician Agreement for cause. Count 2 alleged breach of the Executive Agreement for failure to pay him all of the compensation and benefits he was owed under that contract. Additionally, Dr. Wanna sought attorney fees and expenses under OCGA § 13-6-11. The defendants answered, denying liability and asserting counterclaims for breach of the Physician Agreement and for attorney fees and expenses under OCGA § 13-6-11.

The defendants subsequently moved for summary judgment on Dr. Wanna's claims. The trial court denied the motion, concluding, among other things, that there were genuine issues of material fact regarding the meaning of the agreements and Dr.

Wanna's entitlement to certain compensation, benefits, and attorney fees ("First Summary Judgment Order").[2]

Dr. Wanna filed a motion seeking to compel Navicent to reveal "who made the decision(s)" not to pay him severance, a MIP bonus, SERP benefits, and certain attorney fees. The trial court denied the motion, concluding, among other things, that Dr. Wanna had already received sufficient discovery on the matter ("Discovery Order").

Dr. Wanna later amended his complaint and in addition to spelling out his claims for breach of the Physician Agreement and Executive Agreement in greater detail,[3] he included new claims for fraud, negligent misrepresentation, and violation

_____

[2] In denying Health Services's motion for summary judgment as to the Physician Agreement, the trial court concluded that the Physician Agreement was ambiguous as to whether Health Services guaranteed Dr. Wanna that he could continue to perform surgeries at Coliseum throughout the contractual term, and that there was conflicting parol evidence on the issue. Consequently, the trial court ruled that there was a genuine issue of material fact as to whether Dr. Wanna was entitled to terminate the Physician Agreement for cause based on the change in policy restricting him from continuing to perform surgeries at Coliseum. In its cross-appeal, Health Services does not challenge the trial court's summary judgment ruling regarding the Physician Agreement, and therefore that ruling is not before this Court for review.

[3] During the litigation, the trial court granted judgment on the pleadings to Health Services on Count 1 of Dr. Wanna's complaint to the extent that Dr. Wanna sought certain declaratory relief regarding the Physician Agreement. Dr. Wanna does

12

of ERISA, 29 U. S. C. § 1001 et seq., for failure to pay SERP benefits.[4] Dr. Wanna sought compensatory and punitive damages, as well as OCGA § 13-6-11 attorney fees.

The defendants filed an amended answer and counterclaim in which they reasserted their counterclaim for breach of the Physician Agreement and added claims for breach of the non-compete and non-solicitation covenants in the parties' agreements, breach of the duty of loyalty, and breach of fiduciary duty. The defendants sought compensatory damages (including lost profits), punitive damages, and attorney fees and expenses under OCGA § 13-6-11.

Dr. Wanna filed a motion for partial summary judgment on the defendants' counterclaims, and the defendants filed a motion for summary judgment on Dr. Wanna's new claims raised in his complaint as amended. The trial court thereafter entered an order denying partial summary judgment to Dr. Wanna on the defendants' counterclaims; granting summary judgment to the defendants on Dr. Wanna's claims

not challenge that ruling on appeal.

[4] Also during the litigation, the trial court dismissed Dr. Wanna's state-law breach of contract claim for failure to pay SERP benefits. Additionally, the trial court dismissed a claim that Dr. Wanna had added to his complaint for breach of Navicent's Code of Conduct. Dr. Wanna does not enumerate these rulings as error on appeal.

13

for fraud and negligent misrepresentation; and denying summary judgment to the defendants on Dr. Wanna's remaining claims ("Second Summary Judgment Order"). These companion appeals followed.

*Case No. A20A1401*

1. *Severance.* Count 2 of Dr. Wanna's complaint alleged that Navicent breached the Executive Agreement by failing to pay Dr. Wanna severance after he resigned his executive position for "Good Reason." In its First Summary Judgment Order, the trial court concluded that the Executive Agreement was ambiguous as to whether Dr. Wanna was entitled to resign for "Good Reason" when Navicent made a final decision to materially reduce his salary, or whether he was required to wait to resign until the material reduction in his salary was actually implemented. Given that ambiguity, the trial court ruled that there were genuine issues of material fact as to whether Dr. Wanna resigned for "Good Reason" and thus whether he was entitled to severance. Additionally, the trial court ruled that there were genuine issues of material fact as to whether Dr. Wanna substantially complied with the notice provision of the Executive Agreement before he resigned. Consequently, the trial court denied summary judgment to Navicent on Dr. Wanna's claim for breach of the

Executive Agreement based on the failure to pay him severance. Navicent challenges this summary judgment ruling on appeal.

The interpretation of a contract is normally a question of law for the court to resolve and is subject to de novo review on appeal. *Willesen v. Ernest Communications*, 323 Ga. App. 457, 459 (1) (746 SE2d 755) (2013).

> It is well established that contract construction entails a three-step process, beginning with the trial court's determination as to whether the language is clear and unambiguous. If no construction is required because the language is clear, the court then enforces the contract according to its terms. But if there is ambiguity in some respect, the court then proceeds to the second step, which is to apply the rules of contract construction to resolve the ambiguity. Finally, in the third step, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

(Citation and emphasis omitted.) *Fannie Mae v. Las Colinas Apartments*, 346 Ga. App. 867, 869 (1) (815 SE2d 334) (2018).

Here, Section 4 (b) of the Executive Agreement authorized Dr. Wanna to resign either "For Good Reason" or "Other than For Good Reason," but he was eligible for severance only if he resigned "For Good Reason." Dr. Wanna could resign for "Good Reason at any time," and "Good Reason" was defined in Section 4 (b) (1) (i) to

15

include "any material reduction in [Dr. Wanna's] Base Salary; provided, however, that a uniform reduction in salary consistently applied to other similarly situated employees in addition to [Dr. Wanna] shall not amount to a material reduction under this Agreement."

Furthermore, "Good Reason" did not exist under Section 4 (b) (1) of the Executive Agreement unless certain procedural requirements were met. Specifically, the Executive Agreement provided:

> Good Reason shall not exist unless: (i) [Dr. Wanna] gives [Navicent] a detailed, written statement of the basis for [his] belief that Good Reason exists and gives [Navicent] a thirty (30) day period after the delivery of such statement to cure the basis for such belief and (ii) [Dr. Wanna] actually submits [his] resignation to the Board during the sixty (60) day period which begins immediately after the end of such thirty (30) day period if [Dr. Wanna] reasonably and in good faith determines that Good Reason continues to exist after the end of such thirty (30) day period.

(a) Navicent contends that under the unambiguous language of the Executive Agreement, "Good Reason" existed for Dr. Wanna's resignation only if there was an actual material reduction in his salary. And because Navicent maintains that Dr. Wanna resigned before the material reduction in his salary was implemented and thus before he suffered any actual reduction in compensation, Navicent argues that his

16

resignation was premature and without "Good Reason." In contrast, Dr. Wanna contends that "Good Reason" existed for his resignation once Navicent made a final decision in August 2015 to reduce his salary on a date certain in the future (October 1, 2015), and that he therefore was entitled to resign for "Good Reason at any time" after that final decision was made.

As an initial matter, we note that there is evidence in the record, construed in the light most favorable to Dr. Wanna as the non-movant, reflecting that Dr. Wanna resigned from his executive position effective October 1, 2015, the day that the changes to his position were to be implemented. Hence, even if Dr. Wanna was required to wait to resign until the day his salary reduction was to be implemented in order to resign for "Good Reason," there was evidence that Dr. Wanna waited to resign until that date, precluding the grant of summary judgment in Navicent's favor.

In any event, as noted above, the Executive Agreement provided that Dr. Wanna could resign for "Good Reason at any time" when there was "any material reduction" in his base salary, and we agree with the trial court that this language is ambiguous as to whether the material reduction in Dr. Wanna's salary had to be actually implemented before he could resign for "Good Reason," or whether it was sufficient that Navicent had made a final decision to materially reduce his salary on

17

a future date certain. And the parties have not pointed to any rules of construction that resolve this ambiguity. Accordingly, the issue of what the ambiguous contractual language means must be resolved by a jury, as the trial court properly concluded. See *Fannie Mae*, 346 Ga. App. at 869 (1).

Lastly, we point out that there are genuine issues of material fact as to whether the reduction in Dr. Wanna's salary was a final decision made by Navicent, or whether it was a mere proposal made as part of negotiations over Dr. Wanna's future role in the company (in which case there would be no "Good Reason" for resignation even under Dr. Wanna's construction of the Executive Agreement). Dr. Wanna testified in his deposition that Price told him that a final decision had been made to reduce his base salary by over 32 percent effective October 1, 2015, and that the change was "a done deal, a fait accompli," and that "this is your new position." In contrast, Price testified that he presented Dr. Wanna with a mere recommendation, not a final decision, regarding a change in his salary within Navicent. The conflict in the evidence on this point created an additional factual question for the jury to resolve in determining whether Dr. Wanna resigned for "Good Reason." See *Hillinga v. Intercredit Corp.*, 210 Ga. App. 94, 95-96 (2) (435 SE2d 246) (1993) (factual question as to whether defendant permanently reduced plaintiff's salary or merely

18

deferred payment for a temporary period, thereby resulting in plaintiff's premature resignation, was for jury to resolve); *Jefferson-Pilot Communications Co. v. Phoenix City Broadcasting*, 205 Ga. App. 57, 62 (2) (421 SE2d 295) (1992) (conflicts in evidence as to whether conditions precedent for terminating contract had been satisfied were for jury's resolution).

(b) Navicent further contends that Dr. Wanna did not have "Good Reason" to resign from his executive position because he failed to comply with the notice provision set out in Section 4 (b) (1) of the Executive Agreement. Navicent does not dispute that the September 1, 2015 letter from Dr. Wanna's counsel to Navicent – which explained the basis for his resignation and stated that Navicent had 30 days to cure – satisfied the initial requirement imposed by Section 4 (b) (1) of providing "a detailed, written statement of the basis for [his] belief that Good Reason exists." However, Navicent asserts that after sending that written statement, Dr. Wanna failed to provide Navicent a full 30 days to cure the material reduction in his salary and then failed to submit his resignation to its Board of Directors after the cure period had ended, as required by the notice provision. In contrast, Dr. Wanna asserts that there was evidence that he substantially complied with the notice provision. We agree with Dr. Wanna.

"The general rule in determining contract compliance is substantial compliance, not strict compliance." *Rome Healthcare v. Peach Healthcare System*, 264 Ga. App. 265, 272 (5) (590 SE2d 235) (2003). This rule applies to contractual termination clauses.[5] See *Del Lago Ventures v. QuikTrip Corp.*, 330 Ga. App. 138, 143 (1) (b) (764 SE2d 595) (2014); *Rome Healthcare v. Peach Healthcare System*, 264 Ga. App. 265, 272 (5) (590 SE2d 235) (2003). Substantial compliance with a notice provision governing the termination of a contract "may suffice so long as the contemplated information is communicated." *Wallick v. Period Homes*, 252 Ga. App. 197, 203 (3) (555 SE2d 863) (2001).

In the September 1, 2015 letter from Dr. Wanna's counsel to Navicent announcing his resignation, Dr. Wanna's counsel stated that Navicent would have 30 days to cure the reason for the resignation. An email subsequently sent out by Dr. Wanna and Dr. Saunders stated that Dr. Wanna's announced resignation would be effective October 1, 2015, and Dr. Wanna did not actually stop serving in his executive position until October 1, 2015. Hence, Navicent was afforded an

---

[5] "Strict compliance is the exception, applying to cases concerning termination notices that result in forfeiture of real property rights under a lease or easement, or revocation of a surety." (Citation and punctuation omitted.) *Del Lago Ventures*, 330 Ga. App. at 143 (1) (b). None of those circumstances are present here.

20

opportunity to cure before Dr. Wanna's resignation became effective. Furthermore, there was evidence that on September 24, 2015, an announcement about Dr. Wanna's resignation was made at a Navicent Board meeting that he attended, and thus the Board had actual notice of his resignation. Moreover, Dr. Wanna testified in his deposition that Navicent's General Counsel repeatedly assured him that the notice he had given was sufficient to comply with the Executive Agreement and that Navicent would never refuse to provide him with benefits based on a technicality regarding notice.

Given this combined evidence, we conclude that a jury issue existed as to whether Dr. Wanna substantially complied with the notice provision of the Executive Agreement, and thus as to whether he satisfied the contractual requirements for resigning for "Good Reason." See *Del Lago Ventures*, 330 Ga. App. at 143 (1) (b). Compare *Lager's, LLC v. Palace Laundry*, 247 Ga. App. 260, 262 (1) (543 SE2d 773) (2000) (company did not substantially comply with early termination procedure in contract, as company did not give other contractual party notice of the precise nature of the alleged deficiencies and failed to provide the party with any opportunity to cure as contemplated by the termination provision).

Accordingly, for all of the aforementioned reasons, the trial court committed no error in denying Navicent's motion for summary judgment on Dr. Wanna's claim that Navicent breached the Executive Agreement by failing to pay him severance after his resignation from his executive position for "Good Reason."

2. *2015 MIP Bonus.* Count 2 of Dr. Wanna's complaint also alleged that Navicent breached the Executive Agreement by failing to pay Dr. Wanna his 2015 MIP bonus after his resignation from his executive position. In its First Summary Judgment Order, the trial court concluded that under the MIP, Dr. Wanna was entitled to a MIP bonus in 2015 so long as he was still employed by Navicent or an affiliate at the time that Navicent issued its bonus payments for that year, irrespective of whether he was still employed in an executive position at the time of payment. Based on this construction of the MIP, the trial court denied summary judgment to Navicent on Dr. Wanna's claim for breach of the Executive Agreement for failure to pay his 2015 MIP bonus.

On appeal, Navicent contests the trial court's summary judgment ruling, arguing that under the unambiguous terms of the MIP, Dr. Wanna was entitled to a 2015 MIP bonus only if he was still employed in an executive position with Navicent or an affiliate at the time the bonuses were issued. And because the uncontroverted

evidence shows that Dr. Wanna was no longer employed in such a position when the 2015 MIP bonuses were paid, Navicent claims that it was entitled to summary judgment on this breach-of-contract claim. We agree with Navicent.

Section 3 (a) of the Executive Agreement provided that Dr. Wanna "shall be eligible for annual incentive compensation in an amount to be determined in accordance with the objective standards established in the [MIP] applicable to [Dr. Wanna]." Section 5 of the MIP stated that "Participants must be employed by [Navicent] or an affiliate on the date the Plan payment is made in order to receive a payment, except as provided for in Section 6, Termination of Employment." "Participant" was defined as "an employee in a position eligible to participate in the Plan," which were those employees holding a director, assistant vice president, or vice president position. Section 6 (a), addressing termination, stated in part:

> If . . . a Participant transfers to a non-Plan eligible position within [Navicent] for reasons other than substandard performance, the Incentive Committee in its discretion will determine whether any payment should be made to a Participant had termination of employment not occurred.

If there is no ambiguity in a contract, "we simply enforce the contract according to its terms." *Willesen v. Ernest Communications*, 323 Ga. App. 457, 459

23

(1) (746 SE2d 755) (2013). "Further, a contract should be construed by examining the agreement in its entirety, and not merely by examining isolated clauses and provisions thereof." (Citation and punctuation omitted.) *Richard Haney Ford, Inc. v. Ford Dealer Computer Svcs.*, 218 Ga. App. 315, 316 (1) (b) (461 SE2d 282) (1995). Additionally, "we construe a contract in a manner that does not render any of its language meaningless or mere surplusage." *H & E Innovation v. Shinhan Bank America*, 343 Ga. App. 881, 886 (1) (808 SE2d 258) (2017).

Applying these principles, we conclude that Dr. Wanna's claim for a 2015 MIP bonus failed as a matter of law. Under the unambiguous terms of the MIP, Dr. Wanna had to be a "Participant" who was "employed by [Navicent] or an affiliate on the date the Plan payment is made" to be entitled to a MIP payment for that year. But the uncontroverted evidence shows that Navicent issued its 2015 MIP bonuses to eligible employees on February 26, 2016, by which time Dr. Wanna had resigned from his executive position at Navicent and was employed solely as a physician at Health Services. Hence, when the 2015 bonuses were issued, Dr. Wanna was no longer holding a director, assistant vice president, or vice president position at Navicent or an affiliate and thus was not a "Participant" as defined in the MIP. Therefore, based on the plain language of the MIP and the undisputed evidence of record, Dr. Wanna

24

was no longer entitled to a MIP bonus by the time the 2015 bonuses were issued by Navicent.

In so concluding, we note that Section 6 of the MIP provided a limited means for a former Participant who *transferred* to a non-eligible position with *Navicent* to be paid a bonus at the discretion of the Incentive Committee.[6] However, Dr. Wanna did not transfer to another position with Navicent after resigning from his executive position; rather, he continued to serve in his role as a cardiothoracic surgeon for Health Services and simply increased from working as a part-time surgeon to a full-time surgeon under the amended Physician Agreement. Accordingly, Dr. Wanna was not eligible for a 2015 MIP bonus under Section 6 (a).

Because Dr. Wanna was not eligible for a 2015 MIP bonus under the plain terms of the Executive Agreement and the MIP, his claim for breach of the Executive Agreement for failure to receive such a bonus failed as a matter of law. We therefore

---

[6] Section 5 of the MIP refers to a Participant employed by Navicent "or an affiliate," while as Section 6 (a) refers to a Participant within Navicent but makes no reference to "an affiliate." By referring to Navicent and "an affiliate" in Section 5 and then not referring to "an affiliate" in Section 6 (a), the MIP reflects that Section 6 (a) is not applicable to affiliates of Navicent. Any other construction of Section 6 (a) would treat the term "affiliate" in Section 5 as surplusage, a result that should be avoided under the rules of construction. See *H & E Innovation*, 343 Ga. App. at 886-887 (1).

25

reverse the trial court's denial of summary judgment to Navicent on this breach-of-contract claim.

3. *D & O Liability Insurance Coverage.* Count 2 of Dr. Wanna's complaint also alleged that Navicent breached the Executive Agreement by failing to provide D & O liability insurance coverage for his legal representation when the regulatory compliance issue arose in 2015. More specifically, the complaint alleged that Navicent breached the duty of good faith and fair dealing by failing to identify the compliance issue to Dr. Wanna and instructing him to hire his own counsel, failing to inform him whether he was entitled to D & O liability insurance coverage for his legal representation, and failing to file a claim on his behalf. Consequently, Dr. Wanna sought damages in the amount of the attorney fees he incurred in having to hire counsel at his own expense to address the regulatory compliance issue. The trial court denied summary judgment to Navicent on this claim in its First Summary Judgment Order.

On appeal, Navicent argues that it was entitled to summary judgment on this claim because the Executive Agreement required it to provide D & O liability insurance coverage to Dr. Wanna only in an amount customarily provided to directors and officers of Navicent, and the uncontroverted evidence shows Navicent

26

maintained such standard D &O liability insurance coverage for Dr. Wanna the entire time he was an executive. According to Navicent, Dr. Wanna's claims are based on obligations to inform him about the insurance policy and file a claim on his behalf that were not imposed on Navicent by the Executive Agreement.

Section 3 (f) of the Executive Agreement stated: "Directors and officers liability insurance coverage will be provided to [Dr. Wanna] in an amount customarily provided to directors and officers of [Navicent], to cover [Dr. Wanna] individually and in [his] capacity as an officer of [Navicent]." And while the evidence reflects, as Navicent emphasizes, that it obtained D & O liability insurance coverage for its executives, including Dr. Wanna, that does not end the matter.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Brack v. Brownlee*, 246 Ga. 818, 820 (273 SE2d 390) (1980), quoting Restatement (Second) of Contracts § 231.

> The implied covenant modifies and becomes a part of the provisions of the contract, but the covenant cannot be breached apart from the contract provisions it modifies and therefore cannot provide an independent basis for liability. Similarly, there can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do.

27

(Citations and punctuation omitted.) *Ameris Bank v. Alliance Investment & Mgmt. Co.*, 321 Ga. App. 228, 233-234 (3) (a) (739 SE2d 481) (2013). But, as we have explained, "[o]ne who undertakes to accomplish a certain result agrees by implication to do everything to accomplish the result intended by the parties." (Citation and punctuation omitted.) *Corey v. Clear Channel Outdoor*, 299 Ga. App. 487, 490-491 (1) (b) (683 SE2d 27) (2009). And a breach of the duty of good faith and fair dealing "may arise where a party to a contract acts arbitrarily or capriciously in executing its contractual duties." *Stewart v. Suntrust Mtg.*, 331 Ga. App. 635, 639 (4) (770 SE2d 892) (2015). Put another way, the duty of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." (Citation and punctuation omitted.) *Nemec v. Shrader*, 991 A2d 1120, 1128 (Del. 2010).

Here, Dr. Wanna presented evidence, when construed in his favor, that would support a finding that Navicent arbitrarily and unreasonably undermined his ability to take advantage of the D & O liability insurance to which he was entitled under the Executive Agreement by refusing to tell him the basis for the regulatory compliance issue raised against him and instead instructing him to hire an attorney at his own

28

expense. Furthermore, while Navicent argues that the duty was solely on Dr. Wanna to submit a claim under the policy, Dr. Wanna presented evidence that the usual company practice was for Navicent's Legal Department to determine whether coverage was available for a particular claim and for its General Counsel, Banks, to have the relevant documentation submitted to Navicent's insurance broker. In the present case, however, Navicent did not attempt to submit a claim on Dr. Wanna's behalf when the regulatory compliance issue arose. This combined evidence, viewed in the light most favorable to Dr. Wanna, would support a finding that Navicent breached its duty of good faith and fair dealing as it related to the D & O liability insurance provision of the Executive Agreement. See *Brack*, 246 Ga. at 820. The trial court thus committed no error in denying Navicent's summary judgment motion on this claim.

4. *SERP Benefits.* Dr. Wanna also alleged in his complaint that Navicent improperly failed to pay him his SERP benefits for 2014 and 2015, and he sought to recover those lost benefits under ERISA, 29 USC § 1132 (a) (1) (B).[7] In its First Summary Judgment Order, the trial court denied summary judgment to Navicent on

---

[7] 29 USC § 1132 (a) (1) (B) provides: "A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan[.]"

29

the issue of SERP benefits on the ground that there was a genuine issue of material fact as to whether Dr. Wanna's SERP benefits had vested because of a discrepancy between a summary of the SERP plan provided to Dr. Wanna and the SERP plan document itself. In its Second Summary Judgment Order, the trial court denied summary judgment to Navicent on Dr. Wanna's ERISA claim, again pointing to the parties' divergent arguments as to when vesting occurred and concluding that "questions of material fact remain regarding the vesting of [Dr. Wanna's] SERP benefits and the amount owed to [him]."

On appeal, Navicent contends that the trial court erred in concluding that genuine issues of material fact existed as to whether Dr. Wanna's SERP benefits had vested. According to Navicent, the plain language of the SERP plan document established as a matter of law that Dr. Wanna did not have a vested right to any SERP contributions for any year of his employment as an executive.

The Executive Agreement stated that Dr. Wanna would "be entitled to certain supplemental retirement benefits as may be accorded by [Navicent] to certain senior executives of [Navicent]." Consistent with that contractual provision, while serving in his executive position, Dr. Wanna participated in Navicent's SERP plan. Two documents are at issue pertaining to the SERP plan: (1) a "Summary of Navicent

Health Executive SERP" provided to Dr. Wanna while he served as an executive (the "SERP Summary"), and (2) the SERP plan document (the "SERP Plan"). The SERP Summary stated that an executive's account vested upon, among other things, "the termination by the Executive of his or her employment for good reason (e.g., a material reduction in the Executive's base salary, authority, duties, etc.)." In contrast, the SERP Plan did not provide for vesting upon the termination of an executive for good reason. Rather, the SERP Plan required continuous employment for five years before an executive had any vested right to SERP contributions, subject to an exception for accelerated vesting based on a "separation of service" due to death, disability, or "involuntary separation of service . . . without Cause" initiated by Navicent.

The trial court concluded that a genuine issue of material fact existed as to whether Dr. Wanna's SERP benefits had vested based on the discrepancy between the terms for vesting contained in the SERP Summary and the SERP Plan. However, a summary plan description[8] does not itself constitute the terms of the plan for purposes

---

[8] Our conclusion would not change if the SERP Summary constituted an informal summary rather than a "summary plan description" under 29 USC § 1022. Informal plan summaries likewise do not operate to modify the terms of a formal plan document such as the SERP Plan. See *Alday v. Container Corp. of America*, 906 F2d 660, 665-666 (II) (11th Cir.1990) (individual "Summary of Personal Benefits"

31

of ERISA, and where a conflict exists between the summary and the formal plan document, the plan controls as a matter of law in an action to recover benefits under 29 U.S.C. § 1132 (a) (1) (B). *CIGNA Corp. v. Amara*, 563 U.S. 421, 437-438 (II) (A) (131 SCt 1866, 179 LE2d 843) (2011). See *Central States, Southeast and Southwest Areas Health and Welfare Fund v. Haynes*, 966 F3d 655, 659 (7th Cir. 2020) ("The point of a summary plan description is to summarize; some terms necessarily are omitted. At all events, if the plan and the summary plan description conflict, the plan controls."); *Manuel v. Turner Indus. Group*, 905 F3d 859, 865 (I) (B) (5th Cir. 2018) (same); *Bd. of Trustees v. Moore*, 800 F3d 214, 219 (6th Cir. 2015) (same); *Holmes v. Colorado Coalition for Homeless Long Term Disability Plan*, 762 F3d 1195, 1200 (II) (A) (10th Cir. 2014) (same). Hence, the trial court erred in concluding that the conflict between the SERP Summary and SERP Plan created a genuine issue of material fact as to the terms for vesting of benefits; rather, the terms of the SERP Plan control as a matter of law under *Amara*, 563 U.S. at 437-438 (II) (B).

Dr. Wanna raises other arguments as to why he should be permitted to proceed on his ERISA claim, including whether he met the requirements for accelerated

booklets and letters to employees could not modify the terms of unambiguous plan documents).

32

vesting under the SERP Plan and whether he is entitled to pursue a claim for equitable relief under ERISA. Additionally, Navicent raises alternative arguments as to why it believes summary judgment is appropriate on the ERISA claim. In light of the trial court's reliance on an erroneous legal theory in denying summary judgment on the ERISA claim, we exercise our discretion to vacate the trial court's ruling and remand for the trial court to consider the parties' alternative arguments in the first instance, particularly in light of the voluminous record in this case. See *City Of Gainesville v. Dodd*, 275 Ga. 834, 838-839 (573 SE2d 369) (2002) (appellate courts may remand case to trial court to consider in the first instance alternative grounds raised and disputed by the parties, where the trial court relied on an erroneous legal theory or reasoning in its summary judgment ruling); *Helton v. United Svcs. Auto. Assn.*, 354 Ga. App. 208, 214 (2) (840 SE2d 692) (2020) (vacating and remanding summary judgment order where trial court did not perform correct legal analysis and court did not address all arguments advanced).

5. *OCGA § 13-6-11 Attorney Fees.* In Count 2 of his complaint, Dr. Wanna also asserted a claim for attorney fees and expenses under OCGA § 13-6-11, and the trial court denied summary judgment to the defendants on that claim. On appeal, Navicent argues that because Dr. Wanna cannot succeed on his substantive claims for breach

of the Executive Agreement, he cannot succeed on his derivative attorney fees claim under OCGA § 13-6-11. See *Davis v. Johnson*, 280 Ga. App. 318, 320 (634 SE2d 108) (2006) ("Attorney fees and expenses of litigation under OCGA § 13-6-11[ ] are ancillary and recoverable only where other elements of damage are recoverable on the underlying claim.") (citation and punctuation omitted). Navicent's argument is unpersuasive because it is premised on the assumption that all of Dr. Wanna's substantive claims for breach of the Executive Agreement failed as a matter of law, which, as explained supra, is not the case. Accordingly, we affirm the trial court's denial of Navicent's motion for summary judgment on Dr. Wanna's claim for OCGA § 13-6-11 attorney fees.

*Case No. A20A1378*

6. *Fraud and Negligent Misrepresentation.* Dr. Wanna also alleged in his complaint that Navicent committed fraud and negligent misrepresentation, and the trial court granted Navicent summary judgment on these claims in its Second Summary Judgment Order. In this regard, the trial court concluded that Dr. Wanna's fraud and negligent misrepresentation claims failed as a matter of law because Dr. Wanna was seeking the same damages for these tort claims as he was for his claim for breach of the Executive Agreement, and, therefore, had "asserted no injury

34

independent of those claimed under breach of contract." Dr. Wanna argues on appeal that the trial court erred in its analysis and ruling, and we agree.

The fact that Dr. Wanna's damages sought on his fraud, negligent misrepresentation, and breach-of-contract claims overlap with one another is not fatal to his tort claims at the summary judgment stage of the proceedings.

> [A] plaintiff may pursue any number of consistent or inconsistent remedies against the same person or different persons until he shall obtain a satisfaction from some of them, OCGA § 9-2-4, and any election of remedies, if necessary, could be made *before judgment*.

(Punctuation omitted; emphasis supplied.) *Nebo Ventures v. NovaPro Risk Solutions*, 324 Ga. App. 836, 842 (1) (e) (752 SE2d 18) (2013) (trial court erred in granting summary judgment to defendant on fraud claim in which plaintiff sought its share of unpaid performance bonuses as damages, even if "damages recoverable for the alleged fraud may overlap [with the plaintiff's] damages for breach of contract"; plaintiff could make election between remedies before judgment was entered if plaintiff prevailed at trial on its tort and contract claims). See *Tankersley v. Barker*, 286 Ga. App. 788, 790-791 (2) (651 SE2d 435) (2007) ("One can pursue any number of inconsistent remedies prior to formulation and entry of judgment. Thus, [the plaintiff] was not required to elect her remedy prior to the submission of [her] case

35

to the jury but would have to do so if inconsistent verdicts had been rendered.")
(citation and punctuation omitted).

Rather, the appropriate legal analysis is whether the plaintiff alleged the violation of a duty independent of any duty arising from the parties' contract:

> It is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well, if in addition to violating a contract obligation it also violates a duty owed to plaintiff independent of contract to avoid harming him. But while a tort action cannot be based on the breach of a contractual duty only, it can be based on conduct which, in addition to breaching a duty imposed by contract, also breaches a duty imposed by law.

(Citations and punctuation omitted.) *Northwest Plaza v. Northeast Enterprises*, 305 Ga. App. 182, 191-192 (3) (b) (699 SE2d 410) (2010). See *Nebo Ventures*, 324 Ga. App. at 839 (1) (a).

The trial court focused solely on whether Dr. Wanna alleged the same damages for lost compensation and benefits for his fraud, negligent misrepresentation, and breach-of-contract claims instead of on whether Dr. Wanna alleged the violation of any duties independent of the duties imposed upon Navicent by the Executive

Agreement.[9] Accordingly, we exercise our discretion to vacate the trial court's order and remand for the court to consider whether summary judgment is appropriate on Dr. Wanna's fraud and negligent misrepresentation claims under the proper legal analysis. See *Dodd*, 275 Ga. at 838-839; *Planning Technologies v. Korman*, 290 Ga. App. 715, 720 (660 SE2d 39) (2008) (vacating trial court's summary judgment order and remanding for consideration under proper legal framework). On remand, the trial court also may consider the alternative arguments regarding summary judgment on the fraud and negligent misrepresentation claims that were raised by the parties in the proceedings below but were not addressed by the trial court in its Second Summary Judgment Order. See *Helton*, 354 Ga. App. at 214 (2).[10]

---

[9] The trial court relied on *Davis v. Aetna Cas. & Surety Co.*, 169 Ga. App. 825 (314 SE2d 913) (1984), rev'd in part on other grounds, *Aetna Cas. & Surety Co. v. Davis*, 253 Ga. 376 (320 SE2d 368) (1984), but one of the appellate judges in that case concurred only in the judgment. Consequently, *Davis* is physical precedent only and is not binding on this Court. See Court of Appeals Rule 33.2 (a) (3). Furthermore, the Court of Appeals in *Davis* focused on and analyzed whether the plaintiff alleged the breach of a duty independent of contract, not on whether the damages for the plaintiff's claims overlapped. See *Davis*, 169 Ga. App. at 828.

[10] Dr. Wanna also contends on appeal that the trial court erred by not taking into account and addressing his separate negligent misrepresentation claim against Health Services concerning the Physician Agreement. On remand, the trial court also should address this separate negligent misrepresentation claim raised by Dr. Wanna in determining whether summary judgment should be granted on the negligent misrepresentation claims. See *Laymac v. Kushner*, 349 Ga. App. 727, 740 (4) (824

37

7. Health Services asserted counterclaims against Dr. Wanna for breach of the non-compete covenants contained in the Physician Agreement and the Asset Purchase Agreement. Health Services alleged that Dr. Wanna violated the covenants by, among other things, "providing on call coverage for Coliseum within just a few days after the [Physician] Agreement was terminated and by entering into a call coverage agreement with Coliseum in May 2017."[11] Dr. Wanna moved for summary judgment on Health Services' counterclaims alleging that he violated the restrictive covenants by providing on call coverage at Coliseum, and the trial court denied his motion in its Second Summary Judgment Order.

(a) Dr. Wanna argues that the trial court erred in denying his motion for summary judgment on the counterclaims for breach of the non-compete covenants because the uncontroverted evidence shows that he was entitled to provide on call coverage at Coliseum under the "private practice" exception to the covenants

---

SE2d 768) (2019) (vacating summary judgment ruling and remanding for trial court to consider movant's summary judgment arguments in relation to specific breach-of-contract claim not considered by trial court).

[11] Health Services also alleged that Dr. Wanna breached the non-competition covenants "by providing professional medical services in cardiothoracic surgery in conjunction with Coliseum" and by "continu[ing] to work in conjunction with Coliseum to promote its cardiothoracic surgery program."

contained in the Physician Agreement and the Asset Purchase Agreement. We disagree.

The non-compete covenant in the Physician Agreement provided in part that during the term of the Agreement and for a period of 18 months after the Agreement was terminated on particular grounds, Dr. Wanna

> shall not, within a fifty (50) mile radius of Macon, Georgia (the "Restricted Area"), provide professional medical services in the Specialty as an employee or independent contractor of, or otherwise in conjunction with, another hospital, health system, or other physician organization that competes with [Health Services], [the Medical Center], or [Navicent] . . . .

The Physician Agreement contained a "private practice" exception to the non-compete covenant:

> Notwithstanding the restrictions set forth [in the non-compete covenant], during the Restricted Period and within the Restricted Area, [Dr. Wanna] may enter into private practice provided that such practice is not affiliated with [a Health Services's] Competitor and [Dr. Wanna] remains on the [Medical Center's] medical staff.

The non-compete covenant contained in the Asset Purchase Agreement restricted Dr. Wanna for a period of 54 months after the closing date of the sale of his medical practice from

> providing professional medical services in [his] "Specialty,' . . . as an employee or independent contractor of, or otherwise in conjunction with, another hospital, health system, or other physician organization that competes with [Health Services], the Medical Center . . . or Navicent . . . , except as may be allowed following the Closing . . . under the terms of [his] Physician . . . Agreement with [Health Services].

The Asset Purchase Agreement also included a "private practice" exception to the non-compete covenant that was worded similarly to the exception found in the Physician Agreement:

> Notwithstanding anything to the contrary in [the non-compete covenant] above, Restricted Activities shall not include [Dr. Wanna] entering into private practice, provided that such practice is not affiliated with a [Health Service's] Competitor and [Dr. Wanna] remains on The Medical Center . . . medical staff.

As reflected in the aforementioned language of the Physician Agreement and the Asset Purchase Agreement, the "private practice" exception applied only if Dr. Wanna: (1) did not become "affiliated" with a competitor hospital, health system, or

physician organization and (2) remained on the medical staff at the Medical Center. And, here, Health Services presented evidence, through the affidavit of the former Director of Medical Staff Services for the Medical Center, that Dr. Wanna did not remain on the medical staff of the Medical Center during the entire restrictive period of the non-compete covenants. While Dr. Wanna asserts that he received oral assurances through Health Service's legal counsel that the clause requiring that he remain on the Medical Staff would not be enforced, evidence on that point was disputed. For example, a March 17, 2017 letter from Health Services's counsel to Dr. Wanna's counsel indicated that Health Services was reserving all of its rights under the Physician Agreement and the Asset Purchase Agreement and planned to fully enforce the covenants, and a subsequent March 31, 2017 letter stated that Health Services planned to fully enforce and "protect its rights vigorously" under the covenants. Consequently, genuine issues of material fact exist as to whether the "private practice" exception applies in this case.[12]

(b) Dr. Wanna also contends that the trial court erred in denying his motion for summary judgment on the counterclaims because Health Services lacked a legitimate

---

[12] In light of our ruling, we need not address whether a genuine issue of material fact exists as to whether Dr. Wanna had become "affiliated" with a competitor hospital, health system, or physician organization.

business interest justifying a restriction on him providing on call coverage at Coliseum. We do not agree.

Under Georgia's Restrictive Covenants Act, OCGA § 13-8-50 et seq., a non-compete covenant is valid only if supported by a legitimate business interest. See OCGA § 13-8-55. Here, Health Services's non-compete covenants were supported by its legitimate business interests in protecting its patient relationships and patient good will associated with its ongoing medical practice. See OCGA § 13-8-51 (9) (C), (D) (i) (legitimate business interests include, but are not limited to, substantial relationships with specific prospective or existing patients, and patient good will associated with an ongoing professional practice). See *Heartland Payment Systems v. Stockwell*, __ F. Supp3d __ (III) (D) (2) (U.S. Dist. LEXIS 42363, 2020 WL 1129861) (N. D. Ga. March 5, 2020) (company had legitimate business interest under Georgia law to protect, among other things, its client relationship and goodwill); *Kennedy v. Shave Barber Co.*, 348 Ga. App. 298, 305 (1) (c) (822 SE2d 606) (2018) (noting that company's "non-compete provision was supported by legitimate business interests in that it had devoted considerable resources to developing its name recognition and customer base").

Indeed, in seeking summary judgment, Dr. Wanna did not contend that Health Services failed to show a legitimate business interest in prohibiting him from assisting Coliseum in developing a competing cardiothoracic surgery program. Rather, Dr. Wanna argued that Health Services should not be able to use its non-compete covenants to restrict him from providing on call coverage at Coliseum because "it should be against public policy to prohibit a physician from providing call coverage in an Emergency Department." But Dr. Wanna cited no legal authority, and we have found none, that would require a hospital to allow a physician to provide on call coverage at another hospital, where that hospital otherwise falls within the ambit of a restrictive covenant supported by legitimate business interests, as is the case here when the evidence is construed in favor of Health Services as the non-movant.[13]

_____

[13] Dr. Wanna cited to the Rule of the Georgia Composite Medical Board stating that the Board can take disciplinary action against physicians for unprofessional conduct, including any "practice determined to be below the minimal standards of acceptable and prevailing practice." Ga. Comp. R. & Regs. r. 360-3-.02 (18). Dr. Wanna also cited to two Principles of Medical Ethics in the American Medical Association's ("AMA") Code of Medical Ethics:

VII. A physician shall recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.

IX. A physician shall support access to medical care for all people.

Additionally, Dr. Wanna cited to AMA Ethics Opinion 9.5.1 for the proposition that "[t]he core responsibilities of the organized medical staff are the promotion of patient safety and the quality of care." None of these citations to general rules or principles,

43

Consequently, for these reasons, the trial court committed no error in denying Dr. Wanna's motion for summary judgment on Health Services's counterclaims alleging that he violated the non-compete covenants in the Physician Agreement and the Asset Purchase Agreement by providing on call coverage at Coliseum.

8. Dr. Wanna further contends that the trial court erred in its Second Summary Judgment Order by denying his motion for summary judgment on the defendants' counterclaims for breach of the non-compete and non-solicitation covenants in the parties' agreements, breach of the duty of loyalty, and breach of fiduciary duty because "there is no evidence of lost profits suffered by [the defendants]." According to Dr. Wanna, proof of lost profits was an "essential element" of these counterclaims. We disagree.

> Under OCGA § 13-3-1, the plaintiff in a breach of contract action has the burden of pleading and proving the existence of a valid contract by showing that there are "parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." In addition, in order to prevail on his or her claim, the plaintiff must

---

however, speak to the specific issues raised in this case regarding non-compete covenants. Moreover, contrary to Dr. Wanna's suggestion on appeal, the fact that *Coliseum*'s medical staff bylaws required Dr. Wanna to provide on call coverage there does not affect the legitimacy of Health Services's non-compete covenants.

present evidence from which the jury could find that the defendant breached the contract. Once the plaintiff meets these evidentiary burdens, the defendant is not entitled to summary judgment on the claim, even if the plaintiff fails to present any admissible evidence to establish the amount of actual damages flowing from the breach. This is because, under OCGA § 13-6-6, "[in] every case of breach of contract[,] the injured party has a right to damages, but[,] if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action."

(Citations omitted.) *Eastview Healthcare v. Synertx*, 296 Ga. App. 393, 398-399 (4) (674 SE2d 641) (2009). Thus, even if the defendants failed to come forward with evidence showing lost profits (an issue we need not resolve), the lack of evidence of lost profits would not constitute a viable basis for granting summary judgment to Dr. Wanna on the defendants' counterclaims for breach of the non-compete and non-solicitation covenants in the Executive Agreement, Physician Agreement, and Asset Purchase Agreement. See *Bearoff v. Craton*, 350 Ga. App. 826, 839 (4) (830 SE2d 362) (2019) (plaintiff entitled to recover for breach of non-compete agreement "even in the absence of evidence showing that she suffered actual damages," given that, at a minimum, she would be entitled to recover nominal damages); *Eastview Healthcare*, 296 Ga. App. at 398-399 (4) (trial court properly denied summary

judgment on counterclaim for breach of contract, despite lack of evidence of lost income resulting from the alleged breach).

Nor were lost profits an essential element of the defendants' counterclaims for breach of the duty of loyalty and breach of fiduciary duty. Rather, nominal damages may be awarded so long as there is evidence of some injury, "even if small or nominal," proximately caused by the alleged breach. (Citation and punctuation omitted.) *Willett v. Russell M. Stookey, PC*, 256 Ga. App. 403, 411 (7) (568 SE2d 520) (2002). See *Vernon Library Supplies v. Ard*, 249 Ga. App. 853, 855 (3) (550 SE2d 108) (2001) (noting overlap between claims for breach of the duty of loyalty and breach of fiduciary duty). And, here, the trial court pointed to evidence of injury or damage caused by Dr. Wanna's alleged breaches that had been presented by the defendants in opposition to summary judgment, including evidence that they suffered a reduction in the number of cardiothoracic surgeries and costs incurred in finding a replacement for Dr. Wanna's position.

Accordingly, Dr. Wanna has failed to show any error by the trial court in denying his motion for summary judgment on the defendants' counterclaims for

breach of the non-compete / non-solicitation covenants and breach of the duty of loyalty / fiduciary duty based on their alleged failure to prove lost profits.[14]

9. The defendants asserted counterclaims against Dr. Wanna for attorney fees and expenses under OCGA § 13-6-11[15] based on his alleged bad faith and stubborn litigiousness and causing them unnecessary trouble and expense. In its Second

---

[14] Dr. Wanna also argues that the trial court "erroneously did not eliminate lost profits as a measure of recovery" because an affidavit submitted by the defendants to supply proof of lost profits was untimely under the court-imposed discovery deadline. This matter was raised in Dr. Wanna's motion to exclude the affidavit, but the trial court never ruled on the motion or resolved the issue. "Failure of the trial court to make a final ruling on a motion precludes our review of the motion on appeal. It is the duty of trial counsel to invoke a final ruling on his motions to preserve the record for appellate review," which Dr. Wanna failed to do in this case. (Citations omitted.) *Hilliard v. J. C. Bradford & Co.*, 229 Ga. App. 336, 339 (1) (b) (494 SE2d 38) (1997). Dr. Wanna's argument regarding the timeliness of the defendants' submission of the lost profits affidavit therefore is not subject to review on appeal.

[15]OCGA § 13-6-11 provides:
> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

"Bad faith warranting an award of attorney fees [under OCGA § 13-6-11] must have arisen out of the transaction on which the cause of action is predicated. It may be found in defendant's carrying out the provisions of the contract, that is, in how the defendant acted in his dealing with the plaintiff." (Citation and punctuation omitted.) *Robert E. Canty Bldg. Contractors v. Garrett Machine & Constr.*, 270 Ga. App. 871, 873 (2) (608 SE2d 280) (2004).

47

Summary Judgment Order, the trial court denied summary judgment to Dr. Wanna on these counterclaims, concluding that there were genuine issues of material fact as to whether he acted in bad faith.

On appeal, Dr. Wanna contends that the trial court erred in denying summary judgment to the extent that the counterclaim for OCGA § 13-6-11 attorney fees was predicated on his alleged bad faith in his performance under the Physician Agreement. Dr. Wanna emphasizes that in its First Summary Judgment Order, the trial court concluded that the Physician Agreement was ambiguous as to whether Health Services guaranteed Dr. Wanna that he could continue to perform surgeries at Coliseum during the contractual term.[16] According to Dr. Wanna, the trial court's ruling in its First Summary Judgment Order reflected that there was a bone fide controversy as to how to interpret the Physician Agreement, and he asserts that "[a]ttorney fees for bad faith cannot be awarded where there exists a bona fide controversy." We disagree.

> If there is bad faith in the making or performance under the contract, attorney fees are authorized *regardless of whether a bona fide*

---

[16] As noted supra in footnote 2, the trial court's ruling in its First Summary Judgment Order that the Physician Agreement was ambiguous has not been appealed and is not before this Court for review.

*controversy otherwise existed between the parties*. Further, whether or not the defendant/appellant acted in bad faith in its contractual relations is an issue for the jury to determine.

(Citation and punctuation omitted; emphasis omitted and supplied.) *Robert E. Canty Bldg. Contractors v. Garrett Machine & Constr.*, 270 Ga. App. 871, 873 (2) (608 SE2d 280) (2004). See *Energy & Process Corp. v. Jim Dally & Assoc.*, 291 Ga. App. 772, 776 (2) (662 SE2d 835) (2008) (trial court erred in granting motion for directed verdict on claim for OCGA § 13-6-11 attorney fees because there was evidence from which jury could determine that party acted in bad faith in dealing with opposing party under the contract, regardless of whether a bona fide controversy otherwise existed between the parties). Consequently, Dr. Wanna's assertion that bad faith attorney fees can never be awarded when there is a bona fide controversy is incorrect and provides no basis for reversal of the trial court's summary judgment ruling.[17]

---

[17] Dr. Wanna cites to *Ebco Gen. Agency v. Mitchell*, 186 Ga. App. 874, 875-876 (2) (368 SE2d 782) (1988), but that case involved a dispute over the amount of an insurance refund and merely held that the plaintiff was not entitled to bad faith attorney fees under OCGA § 13-6-11 because there was a bona fide controversy over the amount of refund that was owed. The present case, however, does not involve a simple dispute over the amount of a refund; rather, the case involves multiple issues of fact as to whether Dr. Wanna improperly abandoned his duties under the Physician Agreement before the term of the Physician Agreement had ended and whether he violated the non-compete covenant contained in that contract. Hence, *Ebco Gen.*

49

10. Lastly, Dr. Wanna argues that the trial court erred in denying his motion to compel certain discovery. We disagree.

Dr. Wanna filed a motion to compel Navicent "to reveal who made the decision(s)" not to pay him severance, MIP compensation, SERP benefits, and certain attorney fees. Navicent opposed the motion, contending that it had already provided full discovery regarding the individuals involved in Navicent's determination that Dr. Wanna was not eligible to receive those contractual benefits, and that Navicent had "allowed Dr. Wanna to depose as many of the individuals disclosed as having knowledge about that issue as Dr. Wanna elected to depose." Navicent also asserted that to the extent that Dr. Wanna sought to compel discovery of the internal communications or analysis by Navicent's General Counsel Banks or outside legal counsel about the eligibility question, his motion should be denied based on the attorney-client privilege.

Following a hearing, the filing of deposition transcripts for multiple deponents, and the submission of various documents by Navicent for the court's in-camera review the trial court denied the motion to compel. The trial court found in its Discovery Order that Navicent had "provided Dr. Wanna with the individuals

*Agency* is inapposite to the circumstances here.

involved in making the determination that Dr. Wanna was not eligible to be paid severance, SERP, MIP, or attorneys[ ] fees" and that the discovery provided by Navicent was sufficient. The trial court further found that there was no grounds to "pierce" the attorney-client privilege in this case.

> The trial court's discretion in dealing with discovery matters is very broad, and this [C]ourt has stated on numerous occasions that it will not interfere with the exercise of that discretion absent a clear abuse. [Dr. Wanna has] failed to establish any basis by which the trial court abused its discretion; therefore, its [Discovery Order] is affirmed.

(Punctuation and footnotes omitted.) *De Castro v. Durrell*, 295 Ga. App. 194, 204-205 (3) (671 SE2d 244) (2008). See *Hill, Kertscher & Wharton v. Moody*, 308 Ga. 74, 80 (2) (839 SE2d 535) (2020) (trial court's decision on discovery matters, including matters relating to attorney-client privilege, will not be reversed absent a clear abuse of discretion); *Simon v. Murphy*, 350 Ga. App. 291, 296-297 (2) (829 SE2d 380) (2019) (movant failed to demonstrate that trial court clearly abused discretion in denying motion to compel, where there was evidence in the record reflecting that additional discovery would be immaterial).

*Judgment affirmed in part and vacated in part, and case remanded with direction in A20A1378. Judgment affirmed in part, vacated in part, and reversed in*

*part, and case remanded with direction in A20A1401. Reese, P. J., and Markle, J.,*

*concur.*